☐ Original ☐ Duplic



CLERK'S OFFICE
A TRUE COPY
Jan 29, 2025
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>A purple iPhone, belonging to Lenard Monroe, located at<br>the North Central High Intensity Drug Trafficking Area,<br>11548 W. Theo Trecker Way, West Allis, Wisconsin | )<br>)<br>)<br>)<br>)<br>) Case No. 25-M-328 (SCD) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____ 2-12-25 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Stephen C. Dries _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 1-29-25. 12:20 pm _____

*Judge's signature*

City and state: Milwaukee, WI _____ Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**PROPERTY TO BE SEARCHED**

The property to be searched is a purple Apple iPhone, belonging to LENARD **MONROE**, hereinafter "**the Device**," which is currently located at North Central High Intensity Drug Trafficking Area, 11548 W. Theo Trecker Way, West Allis, Wisconsin.

This warrant authorizes a second attempt of a forensic examination of **the Device** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on **the Device** described in Attachment A that relate to violations of 18 U.S.C. §§ 1956(a), 1956(h), and 1957 (laundering of monetary instruments and conspiracy), 18 U.S.C. § 1035 (false statements regarding health care offenses), 18 U.S.C. § 1347 (health care fraud), and 18 U.S.C. § 2 (aiding and abetting the aforementioned offenses), Title 42, U.S.C. 1320a-7b(b)(2)(A) (Offering or Paying a Healthcare Kickback), and involve Lenard **MONROE**, including, but not limited to:

1.　Member/client files, including but not limited to the complete member files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, member sign in sheets, billing records, test results, laboratory tests and results, photographs, x-rays, physician orders, history and physical forms, treatment plans, plans of care, referrals, prior authorization requests, consultations, correspondence, member contracts, member information, demographic information, and certificates of medical necessity in support of Medicaid claims.

2.　Records reflecting any polices or procedures of First Response Supportive Care (FRSC), A Touch of Love (ATOL), or Wellness Personal Care Service (WPCS), hereinafter "the agencies," including but not limited to billing and training policies and procedures.

3.　Records of member/client complaints, including but not limited to allegations of care not being performed, substandard care, or unnecessary services performed by representatives, employees, and agents of the agencies.

4.　Records related to employees and personnel including but not limited to resumes, application forms, licenses, job titles, position descriptions, time sheets, employment agreements, management reviews, hiring records, communications/records with State of Wisconsin Medicaid, termination records, contracts, payroll records, salaries, current home address of current employees and last known address of former employees, IRS Forms 1099 and W-2, cancelled checks, expense reimbursement documents, and credit card receipts for all current and former agency owners, officers, employees and independent contractors.

5.　Records showing all persons, corporations, partnerships, or entities with an ownership or controlling interest in the agencies.

6.     Communications in any form involving or concerning FRSC, ATOL, and WPCS or any of their agents, contractors, or employees, and any past, actual, or prospective clients of those agencies.

7.     Audio or video recordings, stored in any format, of communications between, or statements of, the agencies, and/or any other person involved in the businesses described in the warrant, and any member or customers thereof.

8.     Contracts with any current or former clients, vendors, affiliates, referral sources, independent contractors, or consultants.

9.     Records that tend to show the activities, location, or compensation of any individual involved in the operation of the FRSC, ATOL, or WPCS, including:

   a.  Calendars, schedules, appointment books, timesheets, or address books;

   b.  Compensation agreements and payments; or

   c.  Documentation related to purchase or other transfer of assets.

10.     Corporate records, including meeting minutes, strategic planning documents, financial projections and budgets, organizational charts, or other records reflecting corporate decision-making and responsibilities.

11.     Financial records reflecting the earnings, income, profits, and assets of the businesses described in the warrant and its owners and corporate officers and directors, including: bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, check books, brokerage and investment account records, stock certificates, credit cards, credit card statements, tax returns, tax return information, appraisal documents, title documents, safe deposit box keys, storage facility keys, and documents evidencing account members and financial assets of the clinic and its owners and corporate officers and directors.

12.     Documents identifying other locations where the agencies may maintain financial, medical, and billing records, such as additional office space or storage units.

13.     Any and all documents relating to COVID-19 loans, including EIDL, HRSA, and PPP loan applications and associated documentation.

14.     Items reflecting the use of file-sharing technology (not to include contents of files shared that are not otherwise within the scope of this attachment).

15.     Records identifying other locations where the businesses/agencies may maintain financial, medical, and billing records, such as additional office space or storage units.

2

16.     Any evidence relating to Paycheck Protection Program (PPP) loan fraud and Economic Injury Disaster Loan (EIDL).

17.     Any information recording schedule or travel.

18.     All bank records, checks, credit card bills, account information, and other financial records.

19.     Photographs and/or videos depicting personal identifying information.

20.     Any contextual information necessary to understand the evidence described in this attachment.

21.     Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage, including any photographic form.



CLERK'S OFFICE
A TRUE COPY
Jan 29, 2025
s/ MMK

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 25-M-328 (SCD) |
| A purple iPhone, belonging to Lenard Monroe, located at the North Central High Intensity Drug Trafficking Area, 11548 W. Theo Trecker Way, West Allis, Wisconsin | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1035, 1347, 1956, and 1957; 42 U.S.C. § 1320a-7b(b)(2)(A) | False Statements Regarding Health Care Offenses, Health Care Fraud, Laundering of Monetary Instruments and conspiracy, Offering or Paying a Healthcare kickback |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Kenneth Folkers*
*Applicant's signature*

Kenneth Folkers, WI DOJ Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 1-29-25

*Judge's signature*

City and state: Milwaukee, Wi

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Special Agent Kenneth Folkers (your Affiant), being duly sworn, do hereby state as follows:

## INTRODUCTION AND EXPERIENCE OF AGENT

1.      I have been employed as a Special Agent for the Wisconsin Department of Justice, Division of Criminal Investigation, since 2020. From 2020-2022, I was assigned to the Medicaid Fraud Control and Elder Abuse Unit ("MFCEAU"). I have been assigned to Major Crimes for the Wisconsin Department of Justice, Division of Criminal Investigation, since 2023. From 2017–2020, I worked as an Auditor–Senior, with the working title of Investigator, with the Wisconsin Department of Justice's Medicaid Fraud Control and Elder Abuse Unit ("MFCEAU").

2.      Prior to joining the Wisconsin Department of Justice, I was employed with the City of Fitchburg Police Department in Fitchburg, Wisconsin, from 2005–2017.

3.      I have over 16 years of experience in Law Enforcement, and for 8 years I worked as a detective. I have investigated numerous complex cases, including homicides, sexual assaults, child abuse, burglary, financial crimes, and drug crimes, among others. Many of these investigations have required collaboration amongst various law enforcement agencies and other community resources. I have conducted investigations by interviewing complainants, witnesses, suspects, and medical personnel; prepared written reports; and maintained protected records. As a Fitchburg officer and detective, I obtained over 50 search warrants and supporting affidavits and executed hundreds of

search warrants. I have obtained documents through subpoenas and testified in federal and state courts.

4. Throughout my career, I've received specialized training in investigations and investigative techniques, including, but not limited to: Advanced Sexual Assault Interviewing; the Reid Technique of Interviewing and Interrogation; Evidence Technician training; Death Investigation School; Background Investigation School; Advanced Gang Investigations and Drug Investigations, including a three-month assignment with the Dane County Narcotics and Gangs Task Force; Sex Trafficking of Children and Youth; Medicaid rules and regulations; criminal and civil case requirements and procedures; ethics; surveillance techniques; and MFCEAU policies.

5. I have received specializing training in Medicaid rules and regulations and have been involved in the investigation related to alleged fraud, abuse, and neglect committed by Medicaid providers against Medicaid recipients and the Medicaid program. Some of the offenses that MFCEAU investigates include: heath care fraud offenses, including by not limited to violations of 18 U.S.C. § 1347, 1349, 1035, as well as the Anti-Kickback statute, contrary to 42 U.S.C. § 1320a-7b(b).

6. I am aware of the federal agencies involved in the administration of the Medicare and Medicaid programs in Wisconsin, including the U.S. DHHS Centers for Medicare & Medicaid Services (CMS) and their various programs. CMS administers the Medicare and Medicaid programs on behalf of the federal government. It is headquartered in Washington, D.C.

2

7.     Medicaid provides health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, elderly adults, and persons with disabilities. The Medicaid program is jointly funded by the states and the federal government.

8.     I am aware of the state agencies involved in administration of the Medicaid program in Wisconsin and their various programs, including the Department of Health Services (DHS). DHS administers Wisconsin Medicaid and is headquartered in the city of Madison, Dane County, Wisconsin.

9.     MFCEAU investigates and prosecutes civil and criminal offenses related to the Medicaid program, which is administered by the State of Wisconsin, subject to federal requirements. MFCEAU operates, in part, through a grant from the U.S. DHHS for the purpose of eliminating fraud in the state Medicaid program. 42 C.F.R. § 1007.

10.    MFCEAU makes available to federal investigators and/or prosecutors all information in its possession concerning fraud in the provision or administration of Medical Assistance under the state plan and cooperates with such officials in coordinating any federal and state investigations or prosecutions involving the same suspects or allegations.

11.    Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).  Rule 41 of the Federal Rules of Criminal Procedure

permits the government to search and seize computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

12. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

13. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

14. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF THIS AFFIDAVIT

15. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing a second attempt for the examination of a purple Apple IPHONE belonging to **LENARD MONROE** (hereinafter "**the Device**") for evidence of violations of Title 18, United States Code, Section 1035 (False Statements Regarding Health Care Offenses); Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, United States Code, Section 1343 (Wire Fraud, 18 U.S.C. §§ 1956(a), 1956(h), and 1957 (laundering of monetary instruments and conspiracy) (hereinafter "**the Target Offenses**"). **The Device** is currently in law

enforcement's possession and securely stored the at North Central High Intensity Drug Trafficking Area (HIDTA), 11548 W. Theo Trecker Way, West Allis, Wisconsin.

16.     The applied-for warrant would authorize a second attempt at forensic examination of the **Device** for the purpose of identifying electronically stored data particularly described in Attachment B. A previous forensic examination attempt was made in May 2023 based on a search warrant for this same device granted by US Magistrate Judge William E. Duffin in the Eastern District of Wisconsin. Computer forensic examiners were unable to bypass encryption security features on their first attempt. Due to the length of time that has elapsed, a new search warrant for a second examination is being requested.

## OVERVIEW OF THE INVESTIGATION

17.     In January 2022, members of the North Central High Intensity Drug Trafficking Area (HIDTA), the Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), and the Internal Revenue Service (IRS) initiated an investigation into individuals distributing large quantities of methamphetamine, heroin, fentanyl, cocaine, and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement officers identified the leader of the drug trafficking organization (DTO) as Phillip DANIELS SR., a/k/a "Dr. Phil" (DANIELS), who has established distribution locations in Milwaukee, Wisconsin; St. Paul/Minneapolis, Minnesota; and Chicago, Illinois. Based on their training, experience, and knowledge of this investigation, case agents believe that beginning by at least September 2020, the DANIELS DTO has distributed in excess of 400 grams of fentanyl, a Schedule II controlled substance, 500 grams of methamphetamine, a Schedule II controlled substances, 5 kilograms of cocaine,

a Schedule II controlled substance, 1 kilogram of heroin, a Schedule I controlled substance, and marijuana, a Schedule I controlled substance.

18.     Court-authorized intercepted communications, video surveillance, phone records, postal records, and financial records reflect that the DANIELS DTO is sourced by numerous sources of supply operating in California.

19.     To date, court-authorized interceptions, physical and electronic surveillance, and postal records reflect that the DANIELS DTO has used United Postal Service (UPS), FedEx, and/or the United States Postal Service (USPS) to ship and receive at least 45 parcels suspected to contain controlled substances, to include methamphetamine, fentanyl, cocaine, and marijuana. During the course of this investigation, two narcotics-laden parcels were lawfully searched, resulting in the seizure of approximately 3 kilograms of cocaine (March 2022) and 1 kilogram of fentanyl (November 2022).

20.     Based on confidential source information, the DTO has also used couriers to drive the controlled substances from California to the Midwest United States at the direction and control of DANIELS. In January 2022, approximately 7 kilograms were seized from a DTO courier while traveling from California to Milwaukee, Wisconsin, at the direction of DANIELS and Jameel BRADLEY SR. (BRADLEY SR.).

21.     Throughout the course of this investigation, various DTO members have used various business bank accounts to conceal and disguise the nature of source of their drug proceeds. The investigation has revealed that DTO members, including DANIELS, his partner Roy HENTON (HENTON), his long-term girlfriend Joelle MASSEY

(MASSEY), and other coconspirators have deposited drug proceeds—in the form of cash and cashiers' checks—into (1) DANIELS' and his wife Betty DANIELS' (B. DANIELS) business account, as well as business accounts set up by the DTO's California sources of supply.

22.     Additionally, the investigation has revealed, through the assistance of the Wisconsin Department of Justice, Division of Criminal Investigations (DCI), that DANIELS, HENTON, B. DANIELS, Lenard **MONROE** (**MONROE**), and others operated various personal and/or supportive care agencies that purported to offer supportive and personal care services. The investigation revealed, however, that the various agencies have billed the State of Wisconsin Medicaid program for personal and/or supportive care services that were not actually rendered. Various individuals for whom these agencies have received Medicaid payments were interviewed and stated that DANIELS, HENTON, B. DANIELS, and **MONROE** received Medicaid payments for services never provided to them.

23.     Bank accounts held in the name of agencies operated by DANIELS, B. DANIELS, and HENTON have received well over $1,500,000 in Medicaid payments from January 2018 to May 2022, despite these accounts reflecting minimal legitimate business expenses and no payroll services. During the same time period, their accounts have received approximately $2 million dollars in unexplained cash, and the accounts reflect withdrawals totaling over $2,700,000.

24.     **MONROE** was the owner of a separate but related agency that purported to offer supportive and personal care services to individuals qualifying for the Wisconsin

Medicaid program. From January 2019 to approximately November 2022, **MONROE's** agency has received at least $5,000,000 in Medicaid payments. Bank records reflect a significant amount of funds were withdrawn as cash, as payments to himself, and as payments to DANIELS' and B. DANIELS' healthcare agency. **MONROE** has also engaged in loan fraud by making false representations regarding his healthcare business to obtain approximately $592,000 in COVID-19-related loan relief. **MONROE** directed his fraudulently obtained loan proceeds to be deposited directly into bank accounts receiving what is believed to be fraudulently obtained Medicaid payments.

25.     The investigation to date has involved a variety of investigative techniques, including but not limited to physical and electronic surveillance, pen register and trap and trace records, interceptions of DTO parcels, interviews with confidential sources, and Title III wire communications interceptions.

26.     In the course of this investigation, the United States District Court for the Eastern District of Wisconsin authorized the following interceptions pursuant to 18 U.S.C. § 2518:

    a.     On August 24, 2022, the Honorable J.P. Stadtmueller issued an Order authorizing the initial interception of wire communications over phone number (262) 599-3332 (Target Telephone 1), used by HENTON, and phone number (213) 444-9828 (Target Telephone 2), used by DANIELS. Interceptions pursuant to this Order began on August 24, 2022 and ended on September 22, 2022.

    b.     On September 30, 2022, the Honorable Pamela Pepper issued an Order authorizing the continued interception of wire communications over Target Telephone 1, used by HENTON; the continued interception of wire communications and the initial interception of electronic communications over Target Telephone 2, used by DANIELS, the initial interception of wire communications over phone number (773) 934-9062 (Target Telephone 3), used by

BRADLEY SR.; and the initial interception of wire and electronic communications over phone number (773) 948-2322 (Target Telephone 4), used by DANIELS. Interceptions pursuant to this Order began on September 30, 2022 and ended on October 29, 2022. However, interceptions over Target Telephone 3 ended on October 20, 2022 due to inactivity.

c.    On November 3, 2022, the Honorable J.P. Stadtmueller issued an Order authorizing the continued interception of wire and electronic communications over Target Telephone 2, used by DANIELS; the continued interception of wire communications over phone number (773) 948-2322 (Target Telephone 4), used by DANIELS; and the initial interception of wire and electronic communications over phone number (708) 635-3573 (Target Telephone 5), used by BRADLEY SR. Interceptions pursuant to this Order began on November 4, 2022 and are scheduled to end at 11:59 p.m. on December 2, 2022.

27.    Identification of callers, phone numbers, and addresses referenced herein have been established over the course of the investigation through the investigative means discussed above, including many conversations of intercepted communications over several months, phone records, information from confidential sources, public records searches, and electronic and personal surveillance. The intercepted calls included in the sections that follow below are provided solely only as examples of the numerous inculpatory interceptions during this investigation. The significance and meaning attributed to the intercepted communications are based on case agents' training, experience, and knowledge thus far derived from this investigation.

28.    On November 23, 2022, US Magistrate Judge Nancy Joseph authorized arrest warrants for 16 individuals in connection with these drug trafficking, fraud, and money laundering conspiracies, including **MONROE**. She also authorized search

warrants for a number of homes, offices, storage lockers, and other premises, including approximately nine locations in the Eastern District of Wisconsin.

29.     These warrants were executed on November 29, 2022, resulting in seizures of multiple kilograms of various controlled substances, hundreds of thousands of dollars in U.S. currency, approximately 20 firearms, and documents believed to related to the fraud and money laundering schemes. **MONROE** was also arrested on that date.

30.     On September 26, 2023, MONROE and others were indicted in the Eastern District of Wisconsin on violations of Title 18, United States Code, Section 1347 (Health Care Fraud, Title 18 U.S.C. §§ 1956(a), 1956(h), and 1957 (laundering of monetary instruments and conspiracy) and Title 42, U.S.C. 1320a-7b(b)(2)(A) (Offering or Paying a Healthcare Kickback). MONROE, DANIELS, MASSEY, HENTON, and B. DANIELS no longer operate any businesses receiving Wisconsin Medicaid funds. MASSEY, DANIELS, and HENTON have been incarcerated pending trial on the above indicted charges since November 2022.

## PROBABLE CAUSE

31.     According to State of Wisconsin Medicaid records, financial records, a forensic extraction of MASSEY's cellular phone obtained pursuant to a federal search warrant in January 2022, and information obtained from confidential sources and other witnesses who have made complaints to the Wisconsin Department of Health Services, DANIELS, B. DANIELS, HENTON, and **MONROE** purported to operate what are known as supportive home care agencies, First Response Supportive Care (FRSC) and A Touch of Love Supportive Care Agency (ATOL), and a personal care agency, Wellness Personal Care Service (WPCS). Based on their training, experience, and knowledge of this

investigation, State of Wisconsin healthcare fraud investigators believe that these agencies are billing Wisconsin Medicaid for services not rendered.

I.     THE WISCONSIN MEDICAID PROGRAM

32.     The Medicaid program is a government assistance program that is jointly funded by the states and the federal government. It provides health care coverage to millions of Americans, particularly eligible low-income adults, children, pregnant women, elderly adults, and persons with disabilities. The Wisconsin Department of Health Services (DHS) administers the Wisconsin Medicaid program on behalf of the state and federal government. It is headquartered in Madison, Wisconsin.

33.     State of Wisconsin healthcare fraud investigators know that the IRIS program (**I**nclude, **R**espect, **I S**elf-Direct) is a Medicaid Home and Community-Based Services (HCBS) waiver program authorized under § 1915(c) of the Social Security Act and approved by the Centers for Medicare and Medicaid Services (CMS). IRIS is a self-directed program for adults with disabilities and elderly people in Wisconsin. To be eligible for the IRIS program, one must be eligible for Medicaid, need the same level of care as someone in a nursing home, and live in a home, apartment, adult family home, or residential care apartment complex. IRIS participants receive a budget for a range of goods, support, and services, including supportive home care (SHC).

34.     SHC includes both direct and indirect assistance with daily functions and individualized needs, designed to promote improved functioning and safety in a participant's home and community. SHC services are comprised of supports or tasks such as:

a. Companion or attendant supports, which may include observation or indirect assistance with self-administration of medications, meal preparation, bill payment, schedule and/or attend appointments, arrangement and/or usage of transportation, and personal assistance in community activities;

b. Chore services; and

c. Routine care, which is the performance of personal services. When routine care is provided, personal care activities may not comprise the entirety of the service. When personal care is available to the participant through the Medicaid State Plan, this option must be used prior to the use of any routine care under SHC.[1]

35. A SHC agency must have a valid Medicaid provider's agreement to provide SHC services under the umbrella of the IRIS program and employ direct-care workers. An IRIS participant may purchase services from a SHC agency, and in those instances, the agency is the sole employer of the direct-care workers, not the IRIS participant.

36. A SHC agency submits SHC claims directly to the participant's Fiscal Employer Agency (FEA) monthly using an IRIS provider invoice, which includes the SHC agency information, the participant's information, dates of service, service codes, units, unit rate, unit type, and the total dollar amount. The FEA adjudicates claims based on the participant's approved authorization. If the claims are authorized, the FEA will submit the claims to DHS for funding. DHS will then fund a zero-balance state-held bank

---

[1] This definition of "routine care" is taken from the IRIS manual. To explain further, SHC is only available through a waiver program such as IRIS. If a participant qualifies for personal care services from Medicaid, the participant must use those services first.

account. The SHC agency then receives reimbursement for the claim through an electronic funds transfer.

37. State of Wisconsin healthcare fraud investigators further know that DHS operates a Personal Care Agency (PCA) program through Medicaid. A PCA is a home health agency, county department, independent living center, American Indian tribe or band, or a freestanding PCA that provides services that are:

a. Medically-oriented activities related to assisting an individual with activities of daily living necessary to maintain the individual in his or her place of residence in the community;

b. Provided upon written orders of a physician by a certified personal care provider; and

c. Provided by a personal care worker employed by the provider or under contract to the provider who is supervised by a registered nurse according to a written plan of care.

38. Wisconsin Medicaid will reimburse a Medicaid-enrolled personal care provider for the following medically necessary services when performed under the supervision of a registered nurse (RN) by a personal care worker (PCW):

d. Assistance with activities of daily living (ADL) such as bathing, dressing, ambulating, toileting, or eating;

e. Accompanying the member to a medical appointment;

f. Light cleaning in essential areas of the home used during personal care service activities; and

g.    Assistance with medically oriented tasks documented in the physician orders.

39.    Medicaid also reimburses for PCWs' travel time to and from a member's home.

40.    Before personal care services can be provided, a personal care screening tool (PCST) must be completed for the member by an RN. The PCST assists providers in determining the number of units to request for prior authorization (PA) of medically necessary personal care services. Then, the PCA's supervising RN must obtain signed and dated physician's orders, conduct an assessment at the member's place of residence, and develop the plan of care based on the PCST. DHS will review the PA request and approve, approve with modifications, or deny.

41.    If the PA is approved, the PCW will be assigned by the supervising RN to the member to do specific tasks according to the written plan of care. The PCW's training for these specific tasks will be assured by the supervising RN. PCWs are required to complete records of care, which include the actual start and end time of personal care each day and the tasks provided to the member for each date of service. For each task, the PCW must record the required information using one of the following methods: placing a checkmark next to each task completed, entering each task into an electronic visit verification system, recording the number of minutes spent on each task, or recording the time each task was started and ended. The member and the PCW must sign and date all records of care. It is imperative that the member's medical records accurately

reflect the correlation among physician orders, plan of care, PCST, and the daily documentation for PCW services.

42.     One way a PCA can submit claims to Wisconsin Medicaid for payment is via the ForwardHealth Portal ("the portal") using direct data entry (DDE). The PCA requests secure access to the portal and, using that login associated with their provider IDs, complete required fields in the portal, including member ID, date of service, procedure code, number of units, charge amount, and place of service. The PCA may only submit claims after the services have been provided, and the PCA is responsible for the accuracy of the claims submitted via the portal. Medicaid remits payments to the PCA based on the approved claims.

43.     Medicaid recipients can be approved to receive both personal care and supportive home care services. Both PCA and SHC agency provider types are regarded by CMS as "high risk" because CMS has found that the PCA and SHC programs are susceptible to fraud. This is because services under both programs are provided in the home by workers with minimal to no training and minimal oversight. SHC agencies in particular pose a fraud risk to the Medicaid program because becoming a SHC provider with IRIS requires significantly fewer steps, and IRIS exercises less oversight over SHC services, as these services do not require the supervision of an RN, physician orders, a PA, and electronic visit verification, and claims are submitted only monthly via a vendor form.

## II.     OVERVIEW OF PERSONAL CARE AGENCIES INVOLVED IN FRAUD

44.     B. DANIELS was listed as the Registered Agent for FRSC on State of Wisconsin Department of Financial Institution documents during the course of this

investigation. A State of Wisconsin Medicaid 2021 "IRIS Provider Application" for FRSC lists B. DANIELS as the owner of FRSC. FRSC is a SHC agency.

45. The provided business address for FRSC during this investigation on State of Wisconsin Department of Financial Institutions documents is 210 Linden Court, Apt. A, Lomira, Wisconsin, which is B. DANIELS' residence. According to a WE Energies representative, First Response SCA LLC was listed as the subscriber of utilities for this address from March 1, 2017, until at least November 2022. DANIELS' was last at this address on approximately November 17, 2022, as reflected by location information.

46. In February 2020, B. DANIELS submitted a "Vender Status Change Form" to Wisconsin IRIS listing the new business address for FRSC as 6815 W. Capitol Drive, Suite #119, Milwaukee, Wisconsin. On April 4, 2020, B. DANIELS submitted another "Vender Status Change Form" listing the business address for FRSC as P.O. Box 080086, Milwaukee, Wisconsin. On September 10, 2021, B. DANIELS signed her "IRIS Provider Application" form and listed P.O. Box 080086 in Milwaukee as the primary office, mailing and billing address for FRSCA. However, also part of this application, B. DANIELS listed the address for FRSC as "6819" W. Capitol Drive, Suite 119, Milwaukee, Wisconsin[2] on an IRS Form W-9, Request for Taxpayer Identification Number and Certification.

47. On July 21, 2022, law enforcement agents entered the two-story office building located at 6815 W. Capitol Drive and located Suite 119 on the first floor. Outside the door of Suite 119 was a sign for "First Response S.C.A." There was also a sign for a

---

[2] Law enforcement believes that B. DANIELS made a transcription error or intentionally misrepresented the correct address of FRSC when noting the address was 6819 rather than 6815.

business called "A Wing & A Care LLC" outside of #119. On November 8, 2022, law enforcement officers again observed these signs outside of Suite 119.

48.     On September 30, 2021, B. DANIELS completed an IRIS Provider Application, which included a "Background Disclosure" form. Question 2 on the form asked, "Were you ever convicted of a crime anywhere, including federal, state, local, military, or tribal courts?" The response box "no" was checked. Although this answer is true of B. DANIELS, DANIELS has multiple felony narcotics convictions. Based on evidence collected thus far, DANIELS appears to be the one actually controlling the business operations of FRSC, however disclosing his actual ownership and control of FRSC would likely have impacted the business's ability to obtain Medicaid funds.

49.     On or about September 10, 2021, B. DANIELS signed the two-page "Wisconsin Medicaid Program Provider Agreement and Acknowledgement of Terms of Participation for Waiver Service Provider Agencies or Individuals," which is required by CMS and DHS. This agreement included an attestation that B. DANIELS agreed to comply with all applicable federal and state laws, regulations, and policies relating to providing home and community-based waiver services and maintain and provide records of services provided.

50.     From approximately January 2019 through August 2021, FRSC bank accounts electronically received approximately $250,000 from Wisconsin Medicaid. Additionally, from March 2019 to May 2020, a bank account controlled solely by B. DANIELS received approximately $10,000 from Wisconsin Medicaid. FRSC bank accounts have also received significant amounts of unexplained cash.

51.     HENTON was the owner/operator of ATOL, listing a business address of 3500 N. Sherman Boulevard, Suite 305, Milwaukee, Wisconsin. ATOL is a SHC agency.

52.     On or about October 29, 2018, HENTON signed the two-page "Wisconsin Medicaid Program Provider Agreement and Acknowledgement of Terms of Participation for Waiver Service Provider Agencies or Individuals," which is required by CMS and DHS. This agreement included an attestation that HENTON agreed to comply with all applicable federal and state laws, regulations, and policies relating to providing home and community-based waiver services and maintain and provide records of services provided.

53.     From January 2019 through October 2021, bank accounts controlled by HENTON in the name of ATOL received approximately $959,000 from the State of Wisconsin Medicaid. ATOL bank accounts have also received unexplained cash deposits.

54.     **MONROE** was listed during this investigation as the Registered Agent of WPCS (according to a 2022 application) and provided to the State of Wisconsin Department of Financial Institutions, the business address of 7607 W. Townsend Street, Suite 104, Milwaukee, Wisconsin. WPCS is a PCA.

55.     WPCS had to complete two separate application processes to become a Medicaid-certified PCA. First was the state certification application process, which has a two-step review process. The first part of the review determines whether an applicant is fit and qualified and includes an analysis of a variety of factors, including financial solvency, personnel qualifications, and criminal background clearance. The second review is completed by an RN who reviews the applicant's policies and procedures to

determine whether they meet DHS code requirements. An on-site survey is conducted after this part of the application is approved and the PCA has cared for at least five clients. The second application process is Medicaid certification. Once WPCS received an on-site survey and recommendation for Medicaid certification, it had to apply separately for certification through the ForwardHealth portal. A PCA cannot not submit claims to Medicaid until it is approved and issued a Medicaid certification number.

56.     On or about February 24, 2022, **MONROE** completed the Wisconsin Medicaid Provider Enrollment Report and listed himself as administrator, managing employee, and contact person throughout. **MONROE** also listed himself as 50% owner and an individual named Tamisha Williams as the other 50% owner. Further, **MONROE** listed approximately 90 PCWs and three RNs as employees of WPCS and included their names, dates of birth, and social security numbers.[3]

57.     Additionally, **MONROE** signed the six-page Wisconsin Medicaid Provider Agreement and Acknowledgement of Terms of Participation form, which is the standard provider agreement used by Wisconsin Medicaid, and in which **MONROE** agreed to the terms of Federal compliance and Wisconsin Medicaid including to abide by all federal, state, and local laws, rules, and regulations. By signature, **MONROE** swore or affirmed under penalty of perjury that the information given in the Agreement was true and accurate. By signature, **MONROE** certified that he read the Online Handbook and all regulations.

---

[3] SHC agencies do not have to provide a list of workers when they apply to IRIS to become SHC providers, so not all identities of workers for FRSC or ATOL are known.

58.     According to State of Wisconsin Medicaid records, WPCS (**MONROE**) received at least $6,000,000 from approximately February 6, 2018 (the date of the first eligible to bill) to mid-November 2022.

### III.     OVERVIEW OF THE MEDICAID FRAUD SCHEME

59.     As detailed below, DANIELS, B. DANIELS, HENTON, **MONROE**, and other DTO members during this investigation have received significant deposits from State of Wisconsin Medicaid and electronic deposits from the State of Wisconsin IRIS program, which is part of the Wisconsin Medicaid program. Many of these accounts also received significant cash deposits during the same time period as the Medicaid deposits.

60.     This investigation has led case agents to believe that DANIELS, B. DANIELS, HENTON, MASSEY, and **MONROE** committed Medicaid fraud by billing the State of Wisconsin Medicaid program for personal and/or supportive care services that are not actually rendered. The investigation to date has revealed that HENTON and DANIELS first offer and provide housing to individuals. After housing is secured, ATOL and FRSC sign individuals up for supportive care services, and at least in some cases, offer discounted rent to individuals who are signed up for supportive cares. Evidence also reveals that ATOL and FRSC are subsequently billing for services that are not rendered. In some instances, evidence reflects that DANIELS and HENTON coach members to feign limitations in activities of daily living to increase the hours that can be billed to Medicaid.

61.     It is further believed that B. DANIELS, who is the Registered Agent for FRSC, was responsible for submitting bills to Wisconsin Medicaid, and that MASSEY and

others assisted the various supportive care agencies in signing people up for services. MASSEY also purported to be a Personal Care Worker for the various agencies.

62.     Case agents believe **MONROE** has worked in tandem with DANIELS, HENTON, and MASSEY. Although he operates and submits bills to Wisconsin Medicaid through WPCS, it is believed that he relied upon DANIELS and HENTON, and others, to recruit prospective clients so that collectively they could continue to submit claims to the Wisconsin Medicaid Program for services never rendered. Through the investigation, case agents have learned that DANIELS and HENTON collectively control various rental units through Berrada Property Management using FRSC and/or ATOL. As detailed within this Affidavit, **MONROE** has paid FRSC approximately $782,000 for what agents perceive to be assistance in securing clients.

63.     During the course of this investigation, case agents learned that DANIELS refers to himself, and others refer to him, as "Dr. Phil." However, investigators searched the public records database for the Wisconsin Department of Safety and Professional Services and were unable to locate any credentials and/or licensing for DANIELS, indicating that DANIELS is not in fact licensed to practice medicine.

## IV.    EVIDENCE OF THE MEDICAID FRAUD SCHEME

### A.  Interviews demonstrate that DANIELS, B. DANIELS, MASSEY, and MONROE billed Wisconsin Medicaid for services not actually rendered.

64.     Multiple individuals for whom ATOL, WPCS, and FRSC have billed Medicaid for services allegedly rendered have said that ATOL, WPCS, and FRSC in fact provided no services to them.

65.     One such client was a confidential source who will hereinafter be referred to as CS 3.[4] CS 3 told case agents that CS 3 met DANIELS and HENTON and after responding to an advertisement for housing assistance in a "blue book" magazine. According to CS 3, the advertisement offered assistance for those on Medicaid. CS 3 suffers from diabetes, seizures, high blood pressure, and broken vertebrae in their back. According to CS 3, MASSEY brought a nurse over to CS 3's apartment for an initial assessment. CS 3 stated, "WPCS and ATOL haven't done anything for me." CS 3 never signed any care worker time sheets (which are required to be completed by the personal or supportive care worker and signed by the client). Based on their training, experience, and knowledge of this investigation, healthcare fraud investigations believe that any signature on timesheets for CS 3 from these businesses that were submitted to Medicaid would contain a forged signature and falsified information alleging services rendered. According to Medicaid records from the State of Wisconsin, since January of 2020, ATOL and WPCS both billed for services allegedly rendered to CS 3 and received payments of approximately $24,580 and $44,700 respectively from the State of Wisconsin Medicaid for those purported services.

66.     On June 21, 2022, law enforcement agents spoke with E.J. regarding ATOL and WPSC. E.J., an elderly female, provided a voluntary statement. E.J. stated she met

---

[4] Beginning in April 2022, CS 3 made statements against CS 3's penal interest. According to law enforcement databases, CS 3 has one felony conviction for battery to a law enforcement officer and one misdemeanor battery conviction. CS 3 has open state cases for felony narcotic distribution charges and a Vehicle Operator Flee/Elude an Officer charge. CS 3 is cooperating in exchange for consideration on the open state charges and for monetary compensation. Thus far, the information provided by CS 3 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 3's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. Moreover, CS 3's information has been corroborated by recorded phone calls. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 3 is credible and CS 3's information reliable

HENTON and DANIELS in approximately February 2020 and they told her they could assist her by providing her with housing. E.J. stated everything DANIELS and HENTON told her turned out to be "a big lie." MASSEY was set to be E.J.'s personal care worker, but never provided any services. HENTON told E.J. she had to sign timesheets attesting that MASSEY had been providing her with services to stay in the apartment, and E.J. had to pay HENTON $550 per month for rent. Additionally, E.J. did not know her Medicaid benefits were going directly to HENTON and DANIELS. E.J. was then moved to a different apartment. E.J. learned HENTON took her out of the IRIS program and moved her to WPCS. E.J. said WPCS did not provide any services for her either. According to E.J., MASSEY brought over a stack of photocopied timesheets that E.J. had to sign. E.J. felt obligated to sign the timesheets even though MASSEY did not perform any services. E.J. left WPCS and ATOL around September 2020. From approximately February 2020 to August 2020, WPCS received a total of $23,195 from Medicaid for services never provided to E.J and ATOL received a total of $15,865 from Medicaid for services never provided to E.J.

67. On June 21, 2022, law enforcement agents interviewed O.H. regarding ATOL. O.H. provided a voluntary statement. O.H. met HENTON and DANIELS after responding to an advertisement for housing assistance in a "blue book" magazine. HENTON and DANIELS informed O.H. that ATOL provided low-income services, such as rental assistance. ATOL had office space near Sherman Boulevard and Fond du Lac Avenue in Milwaukee, Wisconsin (SUBJECT PREMISES 6). DANIELS told O.H. to act like she could not walk and just lay on the couch during the nurse's assessment.

According to O.H., an "older black lady" who claimed to be a Registered Nurse came with MASSEY to O.H's residence for an evaluation. The personal care service paperwork was for WPCS and not ATOL, even though O.H. thought she was dealing with ATOL. O.H. did not sign paperwork for ATOL. In April or May 2020, O.H. noticed her hours were "messed up" and nobody was coming to care for her. O.H. did not know her personal care budget. She believed she was approved for personal care and supportive care. O.H. suffers from asthma, obesity, heart failure, lung/kidney disease and severe depression. O.H. said no care workers came out after the RN's assessment, and she never signed any timesheets. From approximately November 2019 to February 2020, WPCS received $2,884.59 from Wisconsin Medicaid for services never rendered to O.H.

68.     On June 21, 2022, J.P. gave law enforcement a voluntary statement regarding WPCS and ATOL. J.P. said that in 2019, he was receiving services from WPCS and identified **MONROE** as the owner. After J.P. was released from custody in April 2020, **MONROE** introduced J.P. to DANIELS and said that DANIELS could help J.P. with housing through ATOL. Around April 2020, J.P. moved to a different apartment. J. P.'s rent to ATOL was $400 per month, which was picked up by a female named "Nakia." **MONROE** told J.P. that DANIELS could also help with personal care services as well. J.P suffers from epilepsy and needs help with activities of daily living. J.P. said after the meeting with DANIELS, HENTON and Leroy HENTON took over services. Occasionally, MASSEY would pick up J.P.'s laundry to wash. J.P's mother helped him the most with cooking, cleaning, and washing clothes. Leroy HENTON had J.P. call IRIS to set up more services, and J.P. was approved to receive thirty-six hours of personal and

supportive care per week. His budget for services was $2,000 per month, however his budget was deposited into the WPCS bank account controlled by **MONROE**. According to J.P., he never signed paperwork or timesheets for ATOL or WPCS. He did not have an assessment with a Registered Nurse, and no services were provided other than sporadic help with laundry. J.P. stated HENTON, Leroy HENTON, and DANIELS were associated with ATOL, and **MONROE** was associated with WPCS. When issues came up, **MONROE** told J.P to call DANIELS. From approximately June 2019 to March 2022, WPCS received $74,589.82 from Medicaid for services never provided to J.P.

69.    On July 14, 2022, law enforcement officers interviewed A.F. regarding FRSCA. A.F. gave the following voluntary statements. A.F. stated he did not know the name of his current primary care worker, did not know the location of his current supportive care agency, and did not have any contact information for his current supportive care agency. A.F. was asked if he used FRSC before his current supportive care agency, and A.F. stated he had never heard of it. From approximately January 2018 to May 2022, FRSC received approximately $88,000 from Medicaid for services A.F. claims were not provided because he had never heard of the company before the interview.

70.    Additionally, DANIELS has used the address of individuals for whom the DTO has received Medicaid funds to receive parcels containing suspected controlled substances. More specifically, clients D.B. and K.B. have received packages containing suspected controlled substances for DANIELS. According to Medicaid records from the State of Wisconsin, WPCS and ATOL billed for services rendered to D.B. and K.B. and

received payments of approximately $120,000 and $135,000, respectively, for those purported services.

71.     Furthermore, a confidential source referred to hereinafter as "CS 1" told case agents that HENTON had advised CS 1 that HENTON "rounded up" "crackheads" and kept them "in line" by the group.[5] According to CS 1, HENTON's and DANIELS' clients were, in some cases, provided narcotics and were also sometimes forced to log hours to make the healthcare businesses appear legitimate to the government. CS 1 believed the healthcare businesses were a scheme to fraudulently collect money from government and government programs. Additionally, contained within CS 1's telephone was an employment letter DANIELS sent to CS 1 via text. The letter indicates that CS 1 had been accepted for full-time employment with ATOL. In the letter, DANIELS stated that he was the "Chief operating officer" of ATOL. CS 1 indicated that DANIELS wrote this letter so that CS 1's court-ordered travel restrictions would be lifted so that CS 1 could travel to other areas of the United States to sell narcotics for him.

### B.  Interceptions Relating to the Scheme

72.     Court-authorized wiretap interceptions, as described below, have provided further insight into the above-described Medicaid fraud.

---

[5] Beginning in November 2021, a confidential source (CS), CS 1, made statements against CS 1's penal interest. CS 1 has an armed robbery conviction, two firearm convictions, and one federal narcotics trafficking conviction. CS 1 is cooperating in exchange for consideration on the federal narcotics trafficking conviction. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 1's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. CS 1's information has also been corroborated by digital evidence contained on CS 1's cell phone, such as text messages, photographs, and geolocation information. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS 1 is credible and CS 1's information reliable

73.     On September 4, 2022, HENTON, using Target Telephone 1, called a female believed to be a woman named "Delores," using (414) 446-5042. During this call, HENTON asked Delores, "Did she give any information out? About her?" Delores responded, "No, she's gonna send it; remember I told you she's not gonna send it 'til she see you." HENTON then stated, "I know; and then you said she used to have seizures, or what? What supposed [U/I] the case [U/I]?" Delores responded, "Yeah, she has high blood pressure, um . . . and she had a seizure a long time ago; but she said she has to go to the hospital 'cause she's on . . . well, I didn't ask her what was for." In response, HENTON stated, "Okay. I'm gonna have her act on that seizure thing." HENTON then told Delores to send him some paperwork so that he could "write it in this paper and say…," at which point Delores said "Okay."

74.     Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, HENTON and Delores discussed a potential new client for ATOL, and HENTON asked Delores whether the prospective client provided any information about her. Case agents further believe that Delores informed HENTON of some conditions the prospective client indicated she had suffered or was currently suffering, including high blood pressure and one seizure a long time ago. Case agents believe that HENTON told Delores that he was going to counsel the prospective client to use the previous seizure incident to establish the need for personal and/or supportive care services and to substantiate the corresponding Medicaid billing. ("I'm gonna have her act on that seizure thing.")

75.    On September 5, 2022, at approximately 7:00 p.m., HENTON, using Target

Telephone 1, called an unknown female at (414) 501-6250, UF6250. During the intercepted

call, HENTON told UF6250 that he wanted to sign more people up for services every

week (up to 20 people), and that wanted to have a "system." HENTON further stated,

"Anybody got services already, we want to get them right away. Anybody that have

personal care or supportive care services, we want to snatch them right away."

76.    Based on their training, experience, and knowledge of this investigation,

case agents believe that during this call, HENTON discussed a plan for acquiring new

clients for their business. Case agents further believe HENTON instructed UF6250 to

target people who were already receiving personal/supportive care services because if a

member is already receiving personal cares, he could then bill for supportive cares in a

way that makes it harder to detect that services are not being rendered.

77.    On September 7, 2022, at approximately 11:17 a.m., an unidentified female

using (414) 892-1775 ("UF1775") called Target Telephone 1. During the intercepted call,

UF1775 asked HENTON, "It's Delores that does my personal and supportive cares,

right?" HENTON replied, "No, your supportive care with—with A Touch of Love, not

with our company, with A Touch of Love." HENTON stated, "And then I'm gonna come

by there so you can sign all these timesheets. So, I'm gonna come by there, okay?"

78.    Based on their training, experience, and knowledge of this investigation,

case agents believe that UF1775 did not receive legitimate personal and supportive cares

from ATOL because UF1775 appeared to not know who was supposed to be performing

services for her. Furthermore, agents believe that HENTON was compiling records

required by the Medicaid program to make the health care businesses appear legitimate to the government. HENTON's reference to needing UF1775 to sign "all these timesheets" corroborates what some patients have told investigators, that they were instructed to sign approvals for numerous blank or prefilled timesheets at once.

79. On September 12, 2022, at approximately 9:28 a.m., HENTON, using Target Telephone 1, received a call from UF1775. During the intercepted call, UF1775 stated, "Hey, I have a question: The nurse was just here the other day for the evaluation, and now the other one is coming in because she wants me to... Well, she's doing all my check-ins now, but she wants me to tell her what... whoever comes over, you know, to the house... what they do for me every day. I don't know what to say because I don't know how many hours you supposed to be here." HENTON then asked, "Who wants to know that?" UF1775 responded, "IRIS." HENTON asked whether it was "for [her] consultant," and UF1775 acknowledged it was. DANIELS got on HENTON's line and stated, "Okay, so, um, you have Delores...You tell her that A Touch of Love does services. You have multiple people who come, and two of the people is Delores Giller and Joelle Massey. Two of the workers that work for A Touch of Love is Joelle and Delores... and Joelle Massey, right? And your daily activity consists of... one is arranging your clothes…" DANIELS continued, "Helping you pick out and sort your clothes. Two is helping you plan out your day. . . Three is store runs; they make store runs for you. . . Number four, number four is—is meal prep… Uh... uh... number five is to help you to sort out all your bills so you can make bill payments. . . And then they also do take care of your medical and doctor runs, picking up your medications." UF1775 then asked, "And this is what

IRIS will be doing for me?" DANIELS stated, "No, this is what A Touch of Love — this is what A Touch of Love…" HENTON added, "IRIS don't do anything; they just come out." HENTON further stated that they (IRIS) are "supposed to report the case, what A Touch of Love do with the services they give, the services that happen with you every day."

80.     Based on their training, experience, and knowledge of this investigation, case agents believe that during this portion of call, DANIELS instructed UF1775 how to act and what to say to the IRIS consultant (who was visiting shortly) regarding who performs her care services and what kind of services they perform. Case agents further believe DANIELS instructed UF1775 to present false information to the consultant to maximize the amount of personal and/or supportive cares. Case agents further believe HENTON told UF1775 that IRIS does not perform the services that DANIELS told her to describe to the consultant, and that IRIS merely collects information regarding the types of services ATOL performs for UF1775.

81.     As the call continued, DANIELS stated, "Right, I just told you, you gotta write that down. Write that down; say, 'They take care of my baths.' That's another one; write down — say, 'Bathroom. They help me get in and out of the shower,' right? . . . 'They help me get in and out of the shower as well.' You know what I'm saying? "I can't get up and move around; they help me with these needs.'" HENTON added, "You gotta always say that we… 'cause you got very low hours." UF1775 replied, "And that's why they doing this, because they were only were giving you whatever, seven hour a week, and I told her I needed 15, so then I can get you the damn money. But I gotta tell her… she needs to know exactly what they are doing every day, so it's going to be more than pick up my

clothes. She's gonna have to help me get in the shower, then help me get all dress, you know, that kind of. . . ."

82. Case agents believe that during this portion of the call, DANIELS instructed UF1775 to write down what DANIELS told her so she could repeat it to the consultant. He emphasized that she should indicate that she cannot move around and therefore needs more assistance than she was receiving at that time. UF1775 acknowledged that to qualify for more hours of service, and therefore receive a greater allowance, it would need to appear that she has greater limitations. UF1775 also indicated that she needed to be approved for 15 hours of service to be able to get HENTON and DANIELS their "damn money," a likely reference to paying rent to HENTON and DANIELS out of the proceeds of their fraud.

83. As the call continued, DANIELS then stated, ". . . And here's the thing, too, Denise. Let me share this with you. Are you listening to me? . . . I'm gonna share this with you, right? You can... remember me, and you talk about this before. With these services you can't... you have to let your pride go." UF1775 replied, "I know... and I did when the nurse was here." DANIELS continued, "But if the nurse asks, you say, 'Listen, I have a cognitive... I am cognitively delayed, and I know how to count and read and write. I need someone to help me with my bills and to read my mail and different things like that.' Say, 'I'm part of the older generation who didn't know how read and write.' Now, when you give them things like that, they also gives them the ability to write that down and say, 'Well, hey, we never had this; have you talked to your doctors?' 'Yeah, my memory is not good.' 'Have you had a memory test?' Like, 'No.' So now they schedule you for these

things, and these are just simple things that are very easy for us to pass. You follow me? . . . They ask you five or six questions, da-da-da-da. You answer some of them wrong; you got bad memory. Uh... the doctor overlooks it; 'She says she don't know how to read.' He won't even ask you to read nothing; he just really writes it down and says that you are cognitively delayed concerning your reading and your ability and things like that. Those give you hours; they give you—that tells them that the people who are servicing you have—they have to do more for you. Plus, the State requires that anybody who has not—who's cognitively delayed, cannot read, cannot write—are people who are qualified for SSI, qualified for more assistance. So these are—this is just something some of the things we have been able to use over the [U/I]." During this portion of the call, case agents believe that DANIELS told UF1775 to fake a cognitive delay because it generally goes unquestioned by doctors and triggers a need for more services. Additionally, DANIELS indicates that he and HENTON have had clients pretend to suffer from cognitive delay in their years of past business, and that has worked to secure Medicaid funding ("These are just simple things that are very easy for us to pass," and, "This is just something some of the things we have been able to use over the [U/I]").

84.      UF1775 replied, "There are never going to... I mean, I have a college education. So, I mean, they are never going to look into this, right?" DANIELS stated, "No, they are not going to look." UF1775 responded, "Okay, 'cause, clearly, I am bullshitting." DANIELS acknowledged, and HENTON stated, "They are plenty of people that have a college education that [U/I]." UF1775 asked, "When they are on their forties and fifties?" HENTON replied, "Yeah," and UF1775 then stated, "Well, I guess I can be

one of them." During this portion of the call, case agents believe that UF1775 acknowledged she does not have a cognitive delay and that she does not suffer from the limited functioning that she will represent to the consultant. UF1775 asked DANIELS and HENTON whether anyone would later investigate her dishonesty, and they reassured it would not happen.

85. During this same call, DANIELS told UF1775 that "all [the doctors] care about is this: If you tell your doctor something and he puts it in his notes, that's all they care about." DANIELS then stated, "That's why when I go to the doctor with people. I'll go in and list some of the major things that I . . . I list… But I haven't been able to do that with you, per se, so that we can do it with your doctor, because you was at the—that clinic, and we wasn't able to get there. . . You got a real doctor. Once you have a real doctor… you did the… like, I can take you back in there, and I can say, 'Hey, how are you doing? This is my mother-in-law. She is going through this, this, and that. These are some thing that she has never reported…' And then, once you put all that on there, now they will begin to look at your medical. So that's what they was just telling the--over at the other company, they just like, 'Denise having Medicaid. She has very few illnesses. She just has illnesses. She wants disability.' And, like, boom, boom, and I just like, 'Well, there's still proof of the services, because you gotten the services before so…' A lot of companies worry, but your doctor has… a medical condition that allows you to have services, but at the same time, people like IRIS and them, they are not looking in depth. That's why they gave you most services, 'cause they don't really see a big, big medical file; no long medications and all those things like that, 'cause you don't take them. So

that's why with me, before I was telling you, it would have been really good for me and you to had you a regular doctor. We could have you some medications, even though you never took 'em; they just sat in there. They prescribe them to you, sell them to you, and you leave then on the shelf, you know? Different creams, different pills and things like that, so that whenever we want to tell them and say, 'Oh, well, the medication is giving her side effects; this is happening,' they give you hours for that because the [U/I].'" UF1775 stated, "Okay, well, she's gonna be here in a few minutes, so I'm gonna go [U/I] and get my walker [U/I], okay?"

86.     During this portion of the call, agents believe that DANIELS counseled UF1775 on how to interact with her doctor so that her medical records would support additional claims for services. DANIELS further told UF1775 that he goes to the see the doctor with other clients to recite purported symptoms or illnesses for their medical records, and that he could go with UF1775 to do the same with her. DANIELS even suggested that he could pretend to be her son in law. Furthermore, DANIELS indicated that they could also obtain medications that are not really necessary so that they could report problems with side effects in the future and seek approval for even more hours.

87.     Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS, HENTON, and their healthcare companies did not actually provide the services that DANIELS listed, and that UF1775 was among the clients who do not need the services for which they bill the State of Wisconsin Medicaid. Based on their training, experience, and knowledge of this investigation, case agents

know that DANIELS and HENTON have coached clients to maximize funding they receive from Medicaid.

88.     On September 18, 2022, at 6:52 p.m., HENTON received a call on Target Telephone 1 from "Ashley," who was using (414) 975-2595. Ashley said, "Hey, Pops. Uh, question: How much is my rent gonna be this month?" DANIELS joined the call and replied, "It's 350 each month; that's what it is." Ashley responded, "Oh, so you're not gonna give me a discount?" DANIELS replied, "There's not gonna be a discount. Why — why would you have… Oh, oh, oh, 'cause you — right; I apologize. You on services with us now. I- This is Doctor Phil. Let me, let me go over your file and everything and make sure everything is going well, and I'll call you back with it, okay?" Minutes later, at approximately 6:58 p.m., DANIELS, using Target Telephone 1, called Ashley at (414) 975-2595. DANIELS stated, "Hey, Ashley. One 175, okay? . . . That's the rent now."

89.     Based on their training, experience, and knowledge of this investigation, case agents believe that HENTON and DANIELS provided housing for Ashley and that during this call, Ashley wanted to inquire about a discount she believed she was entitled to in the rent she owed them. At first, DANIELS (using HENTON's phone) told "Ashley" that her rent would be $350 and that she was not going to get a "discount." DANIELS then remembered that he and HENTON had begun receiving money from Medicaid for purported services performed for "Ashley," so her rent would be reduced to $175. Based upon this investigation, case agents believe that HENTON and DANIELS were/are providing Ashley with reduced rent in exchange for allowing HENTON and DANIELS to use her name, personal identifying information (PII), and Medicaid numbers to bill

Medicaid for services not actually rendered. Furthermore, on September 12, 2022, a representative at Community Family Care called HENTON inquiring about a certain member that was potentially switching services to HENTON's agency. During this call, HENTON said that they sign people up for supportive cares, "give out monthly stipends," and "help people with" housing. Case agents believe that this is further evidence of the "rent reduction" scheme that was conducted by DANIELS and HENTON.

90.     On September 21, 2022, at 10:26 a.m., HENTON, using Target Telephone 1, received a call from an unidentified male at (414) 275-7073 ("UM7073"). During the intercepted call UM7073 stated, "Okay, I've been calling you for about five or seven days or something, and I ain't been getting no response, but then I see you had just got back from out of town." UM7073 then stated, "Okay, so when you need me, you got my phone number. Let me know something." HENTON replied, "Oh, I definitely gonna be needing you. Uh... if don't get to you today, we definitely gonna get started getting' together tomorrow, okay?" HENTON stated, "And then if you run across somebody, who need service, you know, let me know so we can set them up for a place. I'mma try to make sure that that place be yours and that you have that person living in your house. If she on SSI—Just find you somebody who gonna be on SSI so you can put 'em in the place." HENTON and UM7073 continued to talk about UM7073 getting a person lined up so HENTON could set up an appointment. HENTON said, "Okay? Then I'll give you the application on her and everything, okay? Then we can start her billing."

91.     Based on their training, experience, and knowledge of this investigation, case agents believe that HENTON and UM7073 discussed recruiting more individuals

who could be signed up for personal/supportive cares through ATOL to maximize the funding that they could receive from the State of Wisconsin Medicaid. Agents further believe that HENTON instructed UM7073 to find someone receiving Supplemental Security Income (SSI) because those individuals are presumed to have health issues/disabilities, allowing ATOL to claim the maximum level of services and therefore maximize their Medicaid payments. HENTON did not indicate that any services would actually be rendered.

92.     On October 10, 2022, at 9:56 a.m., HENTON, using Target Telephone 1, called an unidentified female at phone number (414) 803-6337 (UF6337). During the intercepted call, UF6337 asked HENTON why nobody came to pick up the application for services because she has had it ready for a month. UF6337 informed HENTON she needed to be moved out of her place. HENTON stated he does not put people in homes unless they are in his programs. Based on their training, experience, and knowledge of this investigation, health care investigators believe HENTON told UF6337 he would not find UF6337 a new place to live or give her rental assistance unless she enrolled in personal or supportive cares through one of HENTON's agencies for which HENTON could bill the Wisconsin Medicaid program. Based on their training, experience, and knowledge of this investigation, investigators know that HENTON and DANIELS used the client's personal information to bill the Wisconsin Medicaid program even though the personal/supportive cares were never rendered.

93.     On October 17, 2022, at 6:58 p.m., HENTON, using Target Telephone 1, received a call from an unidentified female at phone number (414) 797-5291, (UF5291).

During the intercepted call, HENTON told UF5291 that she and her daughter "Amanda" should call their respective IRIS consultants and inform them that UF5291's daughter "Michelle" was now living with them as their personal care worker. HENTON informed UF5291 that telling IRIS that "Michelle" lives with them would take away the "EVV." HENTON further instructed UF5291 to inform UF5291's IRIS consultant that Michelle is on ATOL's payroll. Based on their training and experience, healthcare fraud investigators know that an "EVV" (Electronic Visit Verification) is the process by which a participant's worker electronically verifies that services were rendered and to verify the location at which services were rendered. Investigators also know that participants whose workers live with them are exempted from EVV. Based on their training and experience, case agents believe that a supportive care agency that is not rendering services has an incentive to not use EVV.

94. On October 27, 2022, at 11:32 p.m., DANIELS, using Target Telephone 2, called MASSEY and spoke to MASSEY and Jameel BRADLEY JR. (BRADLEY SR.'s son) regarding their roles in the process of onboarding new clients, including the paperwork that must be completed. They discussed what was being sent to B. DANIELS, when, and how. DANIELS asked MASSEY, "Is she gettin' what she needs for the… Is she gettin' what she need to send all for the medical records and their physician?" MASSEY replied, "No, she just getting the, uh…" DANIELS interrupted, "But then that's no good. She needs to be able to know. Now you and Jay gonna take over doing that." He continued, "So here's how the processing works: The processing works—The minute that you get that document signed, that needs to get at the doctor's office the same day, because that's

what's holding us from doing the amount of clients that we need to do, okay?" MASSEY told DANIELS, "No, no, no; we don't have the doctor's signature that you're talking about." DANIELS told her, "No, no, no, no. The one client signs for the release of medical records and for the provisional letter. They need to [U/I] the same day. So, what I'm sayin' is, Betty needs that so they can fax it over. But, what will take for Betty to fax it over back [PH] It be better if you guys are going to the doctor's office whatever that [U/I] and submitting that information than having that [U/I] or request for pick up, and then come pick up the medical records and assign position on them. . . . The key focal point is; getting the medical records and getting the signed physician order from we can't send the nurse 'til that's done."

95.    DANIELS then proceeded to explain how he does things. He explained, "This is what I do when I get the paperwork, okay? Every time—So, I treat it like it's gold. BRADLEY JR. clarified, "All I'm doing is sending my documents, ID, health care, social over to Betty through email the signed document I'm taking over to each individuals specified doctor assigned doctor and that's it." DANIELS affirmed, "That's basically it. Then you going—you going to get that same paperwork over so when you give it to them doctors and them, you gotta get that paper back. That's how—sometimes the doctors will take them, okay? But you gotta get the original back, so you gotta let them make a copy. So, they make a copy and put it in their computer. Then you gotta ask them, 'Can I get it signed? Can I get it picked up?'"

96.    DANIELS continued to stress that they need to provide the original with the doctor's signature to B. DANIELS, stating "that original always has to go to Betty and

them. Betty and them always have to have the original uhh signature" of the "physician order" and the "medical order release of medical records." DANIELS also urged them to get back-up contact information for anyone they signed up in case their phone services were cut off. DANIELS further stated, "You win a prize when it's, like, it's almost like I'm willing to give you an extra 20 dollars if you could take that medical record and that physician over to they doctor get it signed pick up the medical record back from the medical office and bring all that back with you and pass it and slap it on Betty's desk. You get what I'm saying? That's, like, that's like a gold mine; that's like a trophy. Like, dang, I didn't just go out and get a client, I ain't just make 'em sign, but I went down to they doctor's office, got the medical records, the medication list, the last three doctors' notes—last three doctor visits, and signed physician order. Boo yeah! Here ya go. That client now can have a nurse come out and see them. You get what I'm trying to tell you."

97.     DANIELS then explained, "That's the process we was looking with **Lenard**. That's how come we didn't get so many done. Now, if you guys hada—hada knew that's what it would take for **Lenard**, you get what I'm saying? We would have been on a different page, because we would have probably did 200 clients with **Lenard**. We wouldn't have missed all of those people with **Lenard**. You get what I'm saying? Okay? And I still left, what, 30 clients? Thirty clients with **Lenard** that I never, that I can never get paid for that's still sitting at his office right now. You hear what I'm saying? That all because we didn't have files and records and we don't know who these people is. And that's one of these things that we want to do now as we keep going forward, is that we

want to build a case file of every individual that's in, uh, that's in the company cause, God forbid something happens and I have to switch all those clients again."

98.     Based on their training, experience, and knowledge of this investigation, healthcare investigators believe that during this call, DANIELS instructed MASSEY and BRADLEY JR. to obtain complete member files as soon as possible and deliver the files to B. DANIELS so the approval process can be expedited. This process will ensure their business can bill for supportive cares and recruit more individuals who could be signed up for supportive cares to maximize the funding the business could receive from the State of Wisconsin Medicaid. Case agents further know that the "Lenard" referred to in this call is Lenard **MONROE**. It appears, based on this call and other similar calls, that the coconspirators are primarily concerned with signing up customers in bulk, with an emphasis on the idea that the registrations themselves are a "gold mine."

99.     On November 15, 2022, at 3:59 p.m., DANIELS, using Target Telephone 2, called B. DANIELS at 414-628-3853. B. DANIELS informed DANIELS that a client with a first initial of "J" was asking to be released from her service agreement. DANIELS said he would talk to the client and get her back on board. He also instructed B. DANIELS not to release any clients without giving him an opportunity to talk to them first. Immediately thereafter, at 4:02 p.m., DANIELS called HENTON at (262) 599-3332. He told HENTON to find J and get her on the phone so that they could find out whether she had switched services. HENTON called DANIELS back with J on the line at 5:28 p.m. DANIELS asked J why she had switched providers, and J replied that it was because she had not been receiving the PCW services she needed. DANIELS told J she was supposed to call him,

and he got J to agree to transfer back. DANIELS informed B. DANIELS of this in a call between them that occurred at 5:50 p.m. This call also provides yet another example of a client who enrolled in supportive care services yet did not actually receive any services.

### C. Text Messages Reflect "Template Billing"

100.    When the contents of MASSEY's cell phone were extracted pursuant to a federal search warrant in January 2022, case agents identified numerous text messages between MASSEY, **MONROE**, DANIELS, and HENTON that indicated that **MONROE**, DANIELS, and HENTON are using MASSEY to perform tasks relating to billing Medicaid. Based on their training, experience, and knowledge of this investigation, case agents believe that the text messages reflect that the parties are engaging in Medicaid billing based on a template, not billing in accordance with actual work performed. The text messages do not discuss topics relating to patient care. Some examples are noted below:

   a. On April 21, 2020, **MONROE** texted MASSEY, "I have nothing for A.B. No timesheets."[6] MASSEY responded, "Ok how far should be [sic] go back?" **MONROE** replied, "Just the last two weeks." MASSEY then wrote, "If possible, can you leave a blank timesheet in the mailbox when you are available to, Thanks!" Based on their training, experience, and knowledge of this investigation, case agents believe MASSEY sought **MONROE**'s guidance regarding the time period that services would be billed for A.B. Case agents further believe MASSEY would not have asked this question if services had actually been rendered and noted in conjunction at the time the work was performed. Further, there were no instructions to MASSEY from **MONROE** on hours of care, who performed the care, and what care was performed by WPCS, suggesting that MASSEY simply "populated" the timesheet.

   b. On June 17, 2020, **MONROE** texted MASSEY, "Forgot to leave [CS 3's] sample timesheet in the mailbox. I'll let you know when I go back and do

---

[6] Where appropriate, initials are being used in place of the actual names given in the text messages described here.

it, apologiezes." Based on their training, experience, and knowledge of the investigation, investigators believe that this "sample timesheet" was used by WPCS and ATOL to bill Medicaid for services never rendered to CS 3. As discussed above, CS 3 told law enforcement that neither business provided any services for them and that they did not sign any timesheets for either company. Any timesheet contained the signature of CS 3 would therefore have been forged.

c. On June 19, 2020, MASSEY texted **MONROE** a photograph of a piece of paper labeled "New Client Info" in black marker. On this piece of paper was personal identifying information, doctor information, phone number, and insurance information of an individual with the initials S.M. The message appears to demonstrate that MASSEY and others involved in the scheme are recruiting and funneling new clients to **MONROE**.

d. On July 6, 2021, MONROE texted MASSEY, "In the mailbox in a yellow envelope, the missing timesheets dates and some blank sheets if you have any questions please call, thanks so much Joelle." MASSEY responded, "Okay so I had to catch a flight earlier today and thought I'd have enough time to be able to come grab them but I wasn't able to, my apologies. I can grab them as soon as I come back ok." Based on their training, experience, investigators believe that most legitimate employee/employer relationships do not involve telling the company owner about an unscheduled flight after it occurs. Investigators also believe that both parties' lack of reference to specific patients, dates of service, service providers, and services rendered indicate that **MONROE** intended for MASSEY to fill the sheets according to predetermined figures and not with the details of services actually rendered.

e. On December 2, 2021, MASSEY texted **MONROE** a photograph of a pre-filled WPCS timesheet for a client named J.A. The timesheet was undated, but multiple assistance categories were already marked with an "X," indicating work was performed. The timesheet was undated and unsigned by any provider or client, but it stated the total hours of care provided for J.A. was "35" and included total mileage of "44.8." A similar text was located on December 2, 2021, wherein MASSEY texted **MONROE** a photograph of a pre-filled timesheet for a client named U.B. The timesheet was undated, but multiple assistance categories were already marked with an "X," indicating work was performed. The undated timesheet was unsigned by any provider or client, but it stated the total hours of care provided for U.B. was "3.25" and included total mileage of "17.5." Based on their training, experience, and knowledge of this investigation, healthcare investigators believe that the pre-filled timesheets suggest that the hours

and mileage claimed therein is not reflective of services that were actually rendered.

f. On December 12, 2021, **MONROE** texted MASSEY, "New clients, [J.H., J.C., M.S., T.W., 5 L.C,] will give you the sample sheet for her." Based on their training, experience, and knowledge of this investigation, investigators believe that **MONROE** was providing instructions to MASSEY about new WPCS clients, indicating MASSEY could fill out timesheets for them. **MONROE** did not provide dates of service, name of provider, or what services the clients would be getting. The language "sample timesheet" itself suggests the illegitimacy of these timesheets, as a legitimate timesheet should reflect work performed by a PCW and approved by the client, rather than a prefilled form.

g. On January 1, 2022, MASSEY texted **MONROE**, "Hi Lenard, I need sample sheets for these clients please [M.R., W.R, M.B., L.M., L.C., M.J.]" **MONROE** replied, "I can," "I also gave those timesheets to Pops [HENTON] and Leroy," and "They also need caregivers especially L.C. because she is new." Based on their training, experience, and knowledge of this investigation, healthcare investigators believe that the sample time sheets are pre-filled, which suggests MASSEY, **MONROE**, and HENTON were not memorializing actual work hours, but rather were simply compiling required records to legitimize the health care businesses.

## D. Financial Analysis

101. To date, the investigation has revealed that HENTON, DANIELS, B. DANIELS, **MONROE**, and other DTO members laundered the proceeds of the DTO and Medicaid fraud through bank accounts at BMO Harris, Wells Fargo, Chase Bank, and Educators Credit Union. Review of bank records reflects that DANIELS, B. DANIELS, HENTON, and others have funneled well over $2 million dollars in suspected drug proceeds through accounts that are held in the name of various supportive care agencies, which are also receiving Medicaid payments from the State of Wisconsin. Additionally, **MONROE** has fraudulently obtained COVID-19-related loans, the proceeds of which were deposited into his business bank account. The information that follows will focus on **MONROE's** accounts.

102. As described above, State of Wisconsin records reflect that **MONROE** was the Managing Employee and Owner, as well as the Registered Agent, of WPCS. On a Medicaid application filed for WPCS in 2022, **MONROE** is listed as 50% owner and Tamisha WILLIAMS as 50% owner. The application lists T. WILLIAMS' address as 595 Settles Brook Court, Suwanee, Georgia. It is believed that T. WILLIAMS has continuously resided in Georgia during the period of this investigation. The same application listed BRADLEY JR., C. DANIELS (DANIELS' now deceased son/nephew), Leroy HENTON, MASSEY, and others as Primary Care Workers. T. WILLIAMS has no criminal history, however, as mentioned above, **MONROE** has a prior Illinois felony conviction for "Conspiracy to distribute 5 or more kilograms of cocaine."

103. According to records from the State of Wisconsin, from approximately January 2019 to the November 2022, WPCS received at least $5,000,000 in Medicaid payments. **MONROE** has used various accounts to receive Medicaid funds, including a Wells Fargo Bank account that will hereinafter be referred to as "WF 2." A review of bank records reflects that WF 2 paid FRSC approximately $782,000 between September 2020 and December 2021. Each payment was made via check, often listing "consulting" or "payroll" in the memo line. However, according to records from the State of Wisconsin, no wages were actually paid to DANIELS/FRSC. Based on their training and experience, and the investigation to date, case agents believe that, despite purporting to be a business account, **MONROE** used WF 2 to hold Medicaid fraud proceeds, to conceal and disguise the nature and source of these fraud proceeds, and to attempt to legitimize his payments to DANIELS/FRSC.

104. According to bank records, **MONROE** also received fraudulent loan funds into WF 2, as described further below, which funds are believed to have been used for non-business reasons. **MONROE** subsequently transferred fraud proceeds from WF 2 to another Wells Fargo bank account (WF 3), as well as two BMO Harris bank accounts (BMO 5 and BMO 6).

### 2. MONROE uses WF 2 to collect Medicaid payments and fraudulently obtained loan proceeds.

105. On September 8, 2020, **MONROE** opened an account ending in x6511 in the name of WPCS at Wells Fargo Bank (WF 2). According to records from the State of Wisconsin, between September 2020 and February 2022, WF 2 received approximately $2,765,084 in Wisconsin Medicaid payments. The Medicaid payments represent 82% of all deposits into WF 2 during this time.

106. Financial records reflect the following in withdrawal from WF 2:

h. From October 2020 to February 2022, T. WILLIAMS received approximately 68 separate checks totaling $691,835. These checks were often in amounts above $10,000, and often noted "consultant fee" in the memo line.

i. Approximately 67 checks were written from WF 2 to FRSC totaling $763,980. The FRSC payments were deposited into BMO Harris bank accounts controlled by DANIELS and B. DANIELS, including BMO 1. Based on their training, experience, and knowledge of this investigation, case agents believe these payments are for assistance in securing clients.

j. **MONROE**, using WF2, also authored approximately 43 separate checks totaling $746,513 to WPCS that were deposited into BMO Harris bank accounts in the name of WPCS in which **MONROE** was the sole signer, to include BMO 5 and BMO 6. These checks often contained the words "consultant" or "payroll" in the memo line. BMO 5 and BMO 6 do not reflect any legitimate business expenses.

k. **MONROE** also received an additional $134,000 in checks from WF 2 made out to **MONROE** himself or LJM Investments, which is his Wisconsin LLC and lists **MONROE** as the Registered Agent. WF 2 checks were also made

out to HENTON, Leroy HENTON, Jameel BRADLEY JR., Jamilah **MONROE** (**MONROE's** wife).

107. According to records from the State of Wisconsin, **MONROE** applied for and received $295,071.54 in Direct Provider Payment Program payments from the Health Resources and Services Administration (HRSA). These funds were deposited into WF 2 on various dates: $16,984 on November 6, 2020; $3,919 on December 16, 2020; and $274,167 on January 26, 2022.

108. The subparagraphs that follow set forth information about the HRSA:

    a. The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Paycheck Protection Program and Health Care Enhancement, and the Coronavirus Response and Relief Supplemental Appropriations Act appropriated funds to reimburse eligible health care providers for health care-related expenses or lost revenues attributable to coronavirus.

    b. The U.S. Department of Health and Human Services' (HHS) established the Provider Relief Fund (PRF) and the HRSA administers the program on behalf of HHS.

    c. The PRF provides financial support to eligible health care providers who experienced lost revenues and allowable expenses attributable to coronavirus during the COVID-19 pandemic. The PRF program was established to protect and maintain national health system capacity.

    d. In total, over $178 billion has been appropriated to the PRF for direct payments to eligible health care providers to prevent, prepare for, and respond to coronavirus.

    e. In addition to the PRF, Congress appropriated $8.5 billion in American Rescue Plan (ARP) Act funds for eligible rural providers and suppliers who serve Medicaid, Children's Health Insurance Program (CHIP), or Medicare patients. HRSA established the ARP Rural program in September 2021, and applications were accepted from September 29, through November 3, 2021. The ARP Rural Program was intended to help address the disproportionate impact that COVID-19 has had on rural communities and rural health care providers. Funding was available to eligible providers who serve rural patients in these communities.

109.    In his applications, **MONROE** attested to the following, in part: "The Recipient certifies that the Payment will only be used to prevent, prepare for, and respond to coronavirus, and that the Payment shall reimburse the Recipient only for health care related expenses or lost revenues that are attributable to coronavirus. The Recipient certifies that it will not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. The Recipient certifies that all information it provides as part of any application for the Payment, as well as all information and reports relating to the Payment that it provides in the future at the request of HHS or the HHS Inspector General, are true, accurate and complete, to the best of its knowledge. The Recipient acknowledges that any deliberate omission, misrepresentation, or falsification of any information contained in this Payment application or future reports may be punishable by criminal, civil, or administrative penalties, including but not limited to revocation of Medicare billing privileges, exclusion from Federal health care programs, and/or the imposition of fines, civil damages, and/or imprisonment."

110.    In a WPCS application signed by **MONROE** on October 20, 2020, he represented the 2019 fiscal year revenues for WPCS was $849,232. Banking records indicate that WF 2 received $682,801.79 from Medicaid and other small healthcare revenue sources, with Wisconsin Medicaid accounting for 87% of incoming funds.

111.    The same application also contained revenue breakdowns by fiscal quarters. WPCS represented that from January 1, 2019 – March 2019, WPCS received $121,279.22 in revenues; however, bank records reflect $107,865.29. From April 1, 2020 –

June 30, 2020, WPCS represented $583,029.17 in revenues; however, records reflect $538,508.00. Based on their training, experience, and knowledge of this investigation, financial investigators believe loan applicants applying for this type of loan have an incentive to misrepresent their gross receipts to qualify for the loan.

112.     Attached to the same application was an IRS Form 1120 – U.S. Corporation Income Tax Return for WPC for the year 2019. The return is unsigned by **MONROE** or the return preparer. The form lists business "Paradon Accounting Service" as the preparer firm and "L. Ellis" as the preparer. L. Ellis is believed to be Lee Ellis, the Registered Agent for Paradon Accounting Services Inc. Lee Ellis has a prior misdemeanor conviction for "petty theft," and what appears to be a felony traffic conviction in Wisconsin for "fleeing an officer," and an additional felony conviction in Wisconsin of "Misappropriation of Person ID to obtain value or benefit." Notably, **MONROE** has written Ellis or Paradon Accounting Service 3 checks totaling $31,000 since November 2020. Based on their training and experience, and the investigation to date, case agents believe these payments are for Ellis' assistance in creating the documents used to commit the loan fraud.

113.     On the IRS Form 1120 U.S. Corporation Income Tax Return, 2019 revenues for WPCS are listed as $849,232. However, banking information indicates 2019 revenues were approximately $682,801.79. Within the application, **MONROE** listed compensation of officers was $227,929. However, at least $391,708.50 was withdrawn in cash from one WPCS bank account. Within the application, **MONROE** listed salary and wages was $72,116. However, banking statements reflect that Paychex debits for payroll and payroll

taxes were $222,515. Based on their training, experience, and knowledge of this investigation, financial investigators believe loan applicants applying for this type of loan have an incentive to misrepresent their financial footprint to qualify for the loan

114.    **MONROE** also filled out an application for a Phase 4 HRSA payment that led to WPCS receiving $274,167.90 on January 26, 2022. In the Phase 4 HRSA application, **MONROE** listed the 2020 total revenues from patient care for WPCS as $1,481,559; however, banking statements reflect it was $1,895,733.63. This is an approximate $1,200,000 increase from the 2019 billing by WPCS and **MONROE**. Accordingly, it appears did not suffer any negative financial effects from the COVID-19 pandemic and, therefore, WPCS was not entitled to relief. Based on their training, experience, and knowledge of this investigation, financial investigators believe **MONROE** had an incentive to represent that WPCS suffered a negative effect from the COIVD-19 pandemic to receive loan proceeds that were at least in part converted to his immediate personal and non-business use.

115.    The same application also contained revenue breakdowns by fiscal quarters. WPCS represented that from July 1, 2019, to September 30, 2019, WPCS received $272,453; however, banking information reflects WPCS received $148,427. The application represented from July 1, 2020, to September 30, 2020, WPC received $243,909 from patient care; however, banking records reflect WPCS actually received at least $475,066.40. Lastly, on the application, **MONROE** alleged WPCS received $250,401 in revenue from October 1, 2020, to December 30, 2020. However, banking records reflect WPCS received at least $541,532. Based on their training, experience, and knowledge of

this investigation, case agents believe **MONROE** deliberately made it appear as though WPCS suffered financially during the COVID-19 pandemic, when in fact WPCS' Medicaid billings increased.

116.    Attached to the same application was an IRS Form 1120 – U.S. Corporation Income Tax Return for WPC for the year 2020. The return is unsigned by **MONROE** or Ellis, who was again listed as the preparer, along with Paradon Accounting Service. As mentioned above, when compared to bank records, it appears the total revenues or gross receipts number was understated by over $350,000. Review of the bank records for WF2 reflects further discrepancies. The compensation of officers is listed as $97,818, but cash withdrawn from WPCS, Zelle payments to WILLIAMS, and checks to **MONROE** total $1,200,000. WPC salaries are listed as $152,111, but non-Paychex checks to employees totaled $174,537, for a difference of $20,000. The debits for Paychex payroll and taxes for 2020 were approximately $120,742.

117.    On January 26, 2022, **MONROE** and WPCS received a $274,167.85 HRSA disbursement payment into WF 2. The same day a check was written from WF 2 to WPCS for $139,000 and deposited into BMO Harris bank account 4832908472, or BMO 6 on the same day. There were also additional checks to WPCS for $50,000 on January 28, 2022, and $80,500 on January 31, 2022, respectively. These checks appear to have been signed by WILLIAMS based on signature comparison. It is unknown where these checks were ultimately deposited.

118.    Medicaid payments and the fraudulent CARES Act disbursements represent 91% of all incoming funds into WF 2 from September 2020 to February 2022.

119.    From September 2020 to February 2022, the total percentage of outgoing funds for WF2 above plus cash withdrawals from the account primarily funded through Medicaid and COVID-19 Cares Act loans was approximately 73%. WF2 also reflects $369,000 paid out to the payroll service PayChex, which prepared IRS Form W-2s, printed payroll checks, and presumably paid associated state and federal withholdings. PayChex and other checks issued to individuals that could possibly be related to payroll, accounted for approximately 22% of outgoing debits from this account. The following depicts deposits and withdrawals for WF 2:

**WF 2 - $3,055,155 in Medicaid and Cares Act Deposits**
**Overview of Withdrawals for WF 2**

| Payment | Percentage of Withdrawal |
|---|---|
| $691,835 payments to WILLIAMS | 21% |
| $763,980 payments to FRSC | 23% |
| $746,513 payments to WPCS (BMO Harris) | 22% |
| $134,000 payments to **MONROE** (LJM or himself) | 4% |
| Total: $2,426,649 (plus $90,321 in cash) to above sources | 73% |

120.    Based on their training and experience, and the investigation to date, case agents believe that the majority of the deposits into WF 2 were Medicaid fraud proceeds. Additionally, case agents believe that, despite purporting to be a business account, **MONROE** used WF 2 to hold Medicaid fraud and loan fraud proceeds, to conceal and disguise the nature and source of these fraud proceeds, and to attempt to legitimize his payments to DANIELS/FRSC.

**2. MONROE transfers proceeds from WF 2 to WF 3 and BMO 5/6.**

121.    From WF 2, WF 3 (**MONROE**'s personal account ending in x7022) received approximately $51,000 and approximately $30,000 in cash deposits and payroll from WPCS. These funds accounted for 85% of the incoming funds into WF 3 from September 2020 – March 2022. From WF 3, **MONROE** paid approximately 35 different individuals approximately $30,000 over CashApp. Review of banking activity for WF 3 reflects far less banking activity than WF 2. There was an approximate total of $95,783 in credits into WF 3 and approximately $95,608 in debits from September 2020 to March 2022 being conducted from this account.

122.    An initial analysis of BMO Harris records reflects that **MONROE** deposited at least 31 checks from WF 2 into at least 3 different BMO Harris accounts, totaling approximately $524,845, as reflected below:[7]

| | |
|---|---|
| Account: 4829439173 – BMO 5 | 14 checks - $154,405 |
| Account: 4832908472 – BMO 6 | 17 checks - $357,540 |
| Account: 4831243965 – now closed | 1 check - $12,900 |

123.    Review of the banking activity reflected in the above-mentioned BMO Harris bank accounts show that, despite the accounts purporting to be business accounts for WPSC, bank records do not reflect the payment of common business expenses including payroll, payments to nurses, clients, or other healthcare expenses.

124.    A review of the BMO Harris records reflects that **MONROE** conducted frequent transfers, moving money to various accounts, and no deposits appear to be from

---

[7] A complete analysis of BMO Harris records is pending.

any other business or source besides cash. For example, **MONROE** conducted the following transactions using his BMO accounts:

| BMO 5 Debits/Credits | BMO 6 Debits/Credits |
|---|---|
| 9/17/2021: $2,727.00 debit – Milwaukee Bucks | 2/4/2022: $10,000 Transfer Credit |
| 9/24/2021: $50,000 Transfer Credit | 2/17/2022: $14,600 Transfer Credit |
| 2/14/2022: $2,954 debit – Nieman Marcus | 3/10/2022: $46,000.00 debit – Withdrawal |
| 5/31/2022: $1,144.67 debit – Milwaukee Bucks | 6/21/2022: $27,300.00 – Transfer Credit |
| 6/24/2022: $12,300 credit – ATM Deposit | 6/8/2022: $129,112.49 debit - Outgoing wire to Makes and Models LLC (Car Dealership) |
| 6/17/2022: $1,144.66 debit – Milwaukee Bucks | |

125. Based on their training and experience, and the investigation to date, case agents believe that BMO 5 and BMO 6 functioned as "slush" accounts for **MONROE** to use Medicaid and loan proceeds from WF 2. Case agents further believe that **MONROE** used WF 2 to hold Medicaid fraud proceeds and fraudulent loan proceeds, which proceeds were subsequently transferred into WF 3, BMO 5, and BMO 6 and believed to have been used for non-business reasons.

126. **MONROE**'s then wife, Jamilah **MONROE** (it is believed the two are no longer married) , also received money in the form of checks and cashier's checks from WPCS (WF 2 and BMO Harris), as follows: $35,000 (12/15/20); $50,000 (1/15/21); $7,000 (1/21/2022); $4,076.00 (4/15/2021); $5,100 (7/9/21, with "gift" written in the memo in the check); $11,000 (9/30/21); $10,000 (4/7/2022). These payments total approximately

$122,176.

### 3. Jamilah MONROE uses healthcare fraud proceeds for down payment for 11611 W. Heather Dr., Milwaukee, Wisconsin.

127.     On December 15, 2020, the $35,000 check to Jamilah MONROE was deposited into her Wells Fargo Money Market Savings account ending in x0671. The balance of her account before the deposit was $7,150.33. The $50,000 check from WPCS was deposited into Jamilah MONROE's same account on January 15, 2021. There were approximately 18 transactions in and out of this account between the deposits. The balance on her account before the $50,000 was $49,775.56. The balance of her account after the deposit was $99,775.56. On January 22, 2021, Jamilah MONROE sent a wire to Frontier Title and Closing Services for $89,125.69.

128.     Records from Frontier Title and Johnson Bank indicate this was used as a down payment for the purchase and building of a new residence for **MONROE** and Jamilah located at 11611 W. Heather Drive, Milwaukee, Wisconsin. Jamilah MONROE obtained a mortgage for the property through Johnson Bank in the amount of $346,750. Included in the file from Frontier Title were 2 "gift letters" signed by **MONROE** that stated the following. "Wellness Personal Care do certify the following: I have made a gift of $35,00 (and $50,000.00 on the respective dates) to Jamilah MONROE, whose relationship is spouse. The gift is to be applied towards the purchase of the property located as 11611 W. Heather Drive, Milwaukee, Wisconsin. No repayment of the gift is expected or implied in the form of cash or by future services of the recipient. The funds given to the homebuyer were not made available to the donor from any person or entity with an interest in the sale of the property including the seller. Real estate agent or broker,

builder, loan officer, or any entity associated with them. The source of the gift is checking account." The residence has subsequently been built and **MONROE** and Jamilah MONROE have been observed at the home.

129.     The deed filed with the Milwaukee County Recorder's Office and the loan application file lists Jamilah MONROE as the sole borrower and owner of the property. The Uniform Residential Loan Application submitted to Johnson Bank states that Jamilah MONROE has been employed with BMO Harris bank for approximately 5 years and her job title is "VP Retail Branch Manager." Based on their training and experience, and the investigation to date, case agents believe that the $89,125.69 from WPCS represent proceeds traceable to healthcare fraud.

### 4. MONROE fraudulently collects PPP payment into a closed BMO Harris bank account, the balance of which was subsequently transferred to BMO 6.

130.     A review of bank records reflects that on January 22, 2021, **MONROE** and WPCS received a Paycheck Protection Program (PPP) loan from BMO Harris Bank in the amount of $147,516.25. The application was signed by **MONROE**, who listed himself as a "Beneficial Owner" and President of WPCS. Banking records are still pending for that time period, but based on the PPP loan application, the sum of $147,516.25 was paid to BMO Harris bank account number ending x3965, which is now closed.

131.     A review of the PPP loan application submitted to BMO Harris shows that **MONROE** again falsely represented WPCS suffered a financial hardship due to the COVID-19 pandemic. **MONROE** stated on the application that his 2020 fiscal quarter 2 gross receipts were less than his fiscal quarter 2 gross receipts for 2019. More specifically, he represented the amount of $229,100 for 2020 and the amount of $320,913 for 2019.

However, banking records reflect that that the approximate number of payments WPCS received from Medicaid for fiscal quarter 2 of 2020 were approximately $538,508, and for fiscal quarter 2 of 2019 were approximately $165,392.62. Based on their training, experience, and knowledge of this investigation, financial investigators believe **MONROE** had an incentive to represent that WPCS suffered a negative effect from the COIVD-19 pandemic to receive loan proceeds that were at least in part converted to his immediate personal and non-business use.

132. **MONROE** also swore to the following in part, on the PPP loan application: "The Applicant has realized a reduction in gross receipts in excess of 25% relative to the relevant comparison time period". "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." "The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud." I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not

more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

133.     **MONROE** applied for and was granted Loan Forgiveness of $147,516.25 on or around December 16, 2021. Based on **MONROE**'s numerous material misrepresentations on prior Cares Act loan applications, his payments to FRSC despite DANIELS/FRSC not being on payroll for WPSC, and the absence of legitimate business activity occurring in BMO 5, BMO 6, and account ending x3965, case agents do not believe that the PPP loan proceeds were supported by financial necessity or were used for any legitimate business purposes.

134.     According to tax records obtained pursuant to an *ex parte* order, **MONROE** and WPSC filed payroll taxes in 2019 and 2020. **MONROE** and Jamilah MONROE filed jointly in 2020 and 2021 and their returns did not reflect income from WPSC, despite the large payments to their numerous bank accounts and subsequent spending. Notably, according to records from the State of Wisconsin, WPSC was provided with 1099 forms that substantiate the Medicaid payments. Therefore, case agents believe that **MONROE** intentionally failed to file accurate personal and business tax returns for 2019, 2020, and 2021 because he would have significant tax liability based on the large Medicaid payments and relative lack of business expenses.

### 5.     MONROE formerly used a Chase Bank account to receive Medicaid funds and EIDL loan proceeds.

135.     On March 7, 2018, WILLIAMS and **MONROE** opened an account at Chase Bank in the name of WPCS ending in x9697 (now closed). According to records from the

State of Wisconsin, x9697 received approximately $2,000,000 in Wisconsin Medicaid payments between approximately January 1, 2019, and September 2020. The Medicaid payments accounted for approximately 87% of the funds deposited.

136.    During the same time frame, WILLIAMS and **MONROE** withdrew approximately $1,220,000 in cash. These withdrawals comprise approximately 67% of the total withdrawals from x9697. Notably, while using x9697, WPCS appeared to use PayChex payroll service. WPCS paid PayChex $322,793, presumably for payroll expenses. WPCS payments to PayChex comprise approximately 13% of the total debits from x9697. While using x9697, WILLIAMS and **MONROE** paid $35,606 in checks to FRSC, DANIELS and B. DANIELS. Finally, WILLIAMS appeared to withdraw or receive approximately $400,000 in cash or Zelle (a third-party electronic payment processor) payments during this time. Based on their training and experience, and the investigation to date, case agents believe that the majority of the deposits into x9697 were Medicaid fraud proceeds.

137.    Additionally, on July 27, 2020, an Economic Injury Disaster Loan (EIDL) in the amount of $149,900 was deposited into WPCS x9697.[8] The balance of the WPCS account before the EIDL loan was $6,682. The same day as receiving the EIDL funds, a $67,000 cashier's check was made out to "LJM Investments" and deposited into a BMO Harris Bank account. The following day $19,000 was sent to WILLIAMS via a Zelle payment into her Bank of America account. According to the Wisconsin Department of Financial Institutions, **MONROE** is the Registered Agent for LJM Investments.

---

[8] The Medicaid payments and the EIDL loan accounted for 94% of the money entering this Wells Fargo account.

138.    According to the EIDL information provided by the Small Business Administration, **MONROE** submitted his EIDL application on July 20, 2020. Among other things, **MONROE** signed and swore to under penalty of perjury was that the "Borrower will use all proceeds of this loan solely as working capital to alleviate economic injury caused by the disaster." **MONROE** also claimed that the gross revenues for WPCS were $708,952. However, bank records reflect that **MONROE** received $801,000 in the 12-month span prior to January 31, 2020. According to Chase bank records, WPCS received approximately $674,000 in Medicaid money in 2019. In 2020, WPCS received approximately $1,384,000. Accordingly, bank records reflect WPCS did not suffer any negative financial effects from the COVID-19 pandemic. Based on their training and experience, case agents believe that **MONROE** underestimated WPCS gross revenues to make it appear WPCS suffered economically to obtain the loan. Based on their training and experience, and the investigation to date, case agents believe that the $149,900 that was deposited into WPCS x9697 is EIDL fraud proceeds.

139.    Account x9697 was closed by Chase Bank on or around September 2020. **MONROE** obtained the EIDL, PPP, and HRSA proceeds through wire fraud, in violation of 18 U.S.C. § 1343. His subsequent transfer of the funds constitutes money laundering, in violation 18 U.S.C. § 1957.

140.    The EIDL Loan, PPP loan, and HRSA loans obtained by **MONROE** were all processed and obtained electronically. Each loan process contained contact e-mails addresses provided by **MONROE**, supporting documentation transferred electronically, I.P. address information, and timestamped records pertaining to the submissions.

**MONROE's** receipt of approximately $600,000.00 in these CARES ACT loan funds is therefore tied to the electronic communications with and data transferred to the Small Business Administration, BMO Harris Bank, and the U.S. Department of Health and Human Services, which processed his loans.

## V.     RECOVERY OF THE DEVICE

141.    As described above, on November 23, 2022, US Magistrate Judge Nancy Joseph authorized search warrants for approximately nine locations in the Eastern District of Wisconsin, including the offices of WPCS. These warrants were executed on November 29, 2022. **MONROE** and several coconspirators were also arrested pursuant to warrants on the same day.

142.    **MONROE** was arrested at his residence on W. Heather Drive in Milwaukee. As the arresting officers prepared to transport **MONROE**, they asked whether there was anything **MONROE** needed to bring with him. **MONROE** asked whether he could bring his phone. **MONROE** was advised he could, and **MONROE** asked Jamilah MONROE to retrieve it. Jamilah MONROE brought **the Device** from inside the house. It was transported with **MONROE** to booking and subsequently transferred to a law enforcement facility in Milwaukee, WI.

143.    On December 5, 2022, US Magistrate Judge William Duffin authorized a search warrant to obtain and analyze the electronic records contained on **the Device.** On or about December 7, 2022, **the Device** was obtained from the law enforcement facility in Milwaukee, Wisconsin, and transferred to the Indiana High Intensity Drug Trafficking Area, 11051 Broadway, Crown Point, Indiana. On or around May 9, 2023, a computer forensic examiner for the Indiana State Police attempted to "crack" or access **the Device**

for computer forensic examination and data retrieval. The examiner was unable to access the device due to the encryption on **the Device.** The passcode for access was not provided by **MONROE** or his legal representatives.

144.    On September 26, 2023, MONROE and others were indicted in the Eastern District of Wisconsin on violations of Title 18, United States Code, Section 1347 (Health Care Fraud, Title 18 U.S.C. §§ 1956(a), 1956(h), and 1957 (laundering of monetary instruments and conspiracy) and Title 42, U.S.C. 1320a-7b(b)(2)(A) (Offering or Paying a Healthcare Kickback).

145.    **The Device** is currently in law enforcement's possession at HIDTA, located at 11548 W. Theo Trecker Way, West Allis, Wisconsin. In my training and experience, I know that **the Device** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when **the Device** first came into the possession of law enforcement.

146.    As detailed above, case agents know that **MONROE** has used his phone in furtherance of the **Target Offenses**, such as by exchanging text messages with MASSEY regarding template billing to Medicaid. There is also probable cause to believe that **MONROE** may have used the **Device** to carry out other activities related to the **Target Offenses** that can be performed using cellular service or the internet, such as placing or receiving calls and/or text messages to or from clients or coconspirators, performing actions related to the above-described bank accounts, and submitting documents online to Wisconsin Medicaid, the Small Business Administration, BMO Harris Bank, and the U.S. Department of Health and Human Services that are relevant to the **Target Offenses**.

Case agents therefore believe based on their training and experience that **the Device** will contain evidence of the **Target Offenses**.

<u>**TECHNICAL TERMS**</u>

147.    Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.   Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.   Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.   Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on

the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

148. Based on my training and experience, I know that **the Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and a PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used **the Device**.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

149. Based on my knowledge, training, and experience, I know that electronic devices—like **the Device**—can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices. This information can sometimes be recovered with forensics tools.

150. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **the Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **the Device** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

65

b. Forensic evidence on a device can also indicate who has used or controlled that device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

151. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **the Device** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of **the Device** to human inspection in order to determine whether it is evidence described by the warrant.

152. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

66

## CONCLUSION

153.    I submit that this affidavit supports probable cause for a search warrant authorizing a second attempt at the examination of the **Device** described in Attachment A to seek the items described in Attachment B.

**ATTACHMENT A**
**PROPERTY TO BE SEARCHED**

The property to be searched is a purple Apple iPhone, belonging to LENARD

**MONROE**, hereinafter "**the Device**," which is currently located at North Central High

Intensity Drug Trafficking Area, 11548 W. Theo Trecker Way, West Allis, Wisconsin.

This warrant authorizes a second attempt of a forensic examination of **the Device**

for the purpose of identifying the electronically stored information described in

Attachment B.

## ATTACHMENT B

All records on **the Device** described in Attachment A that relate to violations of 18 U.S.C. §§ 1956(a), 1956(h), and 1957 (laundering of monetary instruments and conspiracy), 18 U.S.C. § 1035 (false statements regarding health care offenses), 18 U.S.C. § 1347 (health care fraud), and 18 U.S.C. § 2 (aiding and abetting the aforementioned offenses), Title 42, U.S.C. 1320a-7b(b)(2)(A) (Offering or Paying a Healthcare Kickback), and involve Lenard **MONROE**, including, but not limited to:

1.      Member/client files, including but not limited to the complete member files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, member sign in sheets, billing records, test results, laboratory tests and results, photographs, x-rays, physician orders, history and physical forms, treatment plans, plans of care, referrals, prior authorization requests, consultations, correspondence, member contracts, member information, demographic information, and certificates of medical necessity in support of Medicaid claims.

2.      Records reflecting any polices or procedures of First Response Supportive Care (FRSC), A Touch of Love (ATOL), or Wellness Personal Care Service (WPCS), hereinafter "the agencies," including but not limited to billing and training policies and procedures.

3.      Records of member/client complaints, including but not limited to allegations of care not being performed, substandard care, or unnecessary services performed by representatives, employees, and agents of the agencies.

4.      Records related to employees and personnel including but not limited to resumes, application forms, licenses, job titles, position descriptions, time sheets, employment agreements, management reviews, hiring records, communications/records with State of Wisconsin Medicaid, termination records, contracts, payroll records, salaries, current home address of current employees and last known address of former employees, IRS Forms 1099 and W-2, cancelled checks, expense reimbursement documents, and credit card receipts for all current and former agency owners, officers, employees and independent contractors.

5.      Records showing all persons, corporations, partnerships, or entities with an ownership or controlling interest in the agencies.

6.      Communications in any form involving or concerning FRSC, ATOL, and WPCS or any of their agents, contractors, or employees, and any past, actual, or prospective clients of those agencies.

7.      Audio or video recordings, stored in any format, of communications between, or statements of, the agencies, and/or any other person involved in the businesses described in the warrant, and any member or customers thereof.

8.      Contracts with any current or former clients, vendors, affiliates, referral sources, independent contractors, or consultants.

9.      Records that tend to show the activities, location, or compensation of any individual involved in the operation of the FRSC, ATOL, or WPCS, including:

      a.  Calendars, schedules, appointment books, timesheets, or address books;

      b.  Compensation agreements and payments; or

      c.  Documentation related to purchase or other transfer of assets.

10.     Corporate records, including meeting minutes, strategic planning documents, financial projections and budgets, organizational charts, or other records reflecting corporate decision-making and responsibilities.

11.     Financial records reflecting the earnings, income, profits, and assets of the businesses described in the warrant and its owners and corporate officers and directors, including: bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, check books, brokerage and investment account records, stock certificates, credit cards, credit card statements, tax returns, tax return information, appraisal documents, title documents, safe deposit box keys, storage facility keys, and documents evidencing account members and financial assets of the clinic and its owners and corporate officers and directors.

12.     Documents identifying other locations where the agencies may maintain financial, medical, and billing records, such as additional office space or storage units.

13.     Any and all documents relating to COVID-19 loans, including EIDL, HRSA, and PPP loan applications and associated documentation.

14.     Items reflecting the use of file-sharing technology (not to include contents of files shared that are not otherwise within the scope of this attachment).

15.     Records identifying other locations where the businesses/agencies may maintain financial, medical, and billing records, such as additional office space or storage units.

2

16.     Any evidence relating to Paycheck Protection Program (PPP) loan fraud and Economic Injury Disaster Loan (EIDL).

17.     Any information recording schedule or travel.

18.     All bank records, checks, credit card bills, account information, and other financial records.

19.     Photographs and/or videos depicting personal identifying information.

20.     Any contextual information necessary to understand the evidence described in this attachment.

21.     Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage, including any photographic form.